## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| **AMBER CARR, on behalf of minor, Z.C.** | § | |
| | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | **CIVIL ACTION NO. 4:21-cv-1053** |
| **AARON DEAN, THE CITY OF FORT WORTH, POLICE CHIEF ED KRAUS, and MAYOR BETSY PRICE** | § | **JURY TRIAL DEMANDED** |
| | § | |
| | § | |
| | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

## PLAINTIFF'S COMPLAINT

Plaintiff AMBER CARR, on behalf of minor Z.C. ("Plaintiff" or "Ms. Carr"), by and through her attorneys, ELLWANGER LAW LLLP, brings this action for damages and other legal and equitable relief from Defendants for violations of the Fourth Amendment of the US Constitution under 42 U.S.C. § 1983, and any other cause(s) of action that can be inferred from the facts set forth herein.

## INTRODUCTION

1.      This is an action brought by Amber Carr on behalf of her minor son, Z.C., for the injuries done by Defendants. On October 12, 2019, Atatiana Jefferson ("Ms. Jefferson") was shot and killed by Defendant Aaron Dean, a Fort Worth, Texas police officer, in her own home without any provocation and in the immediate presence of minor Z.C. At the age of 8, Z.C. was forced to watch the murder of his aunt, Atatiana Jefferson, at the hands of Fort Worth Police. On Z.C.'s

**ORIGINAL COMPLAINT**

behalf, Ms. Carr now seeks damages and injunctive relief under 42 U.S.C. § 1983 for these violations of his Fourth Amendment rights.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, which confers original jurisdiction upon this Court for actions arising under the laws of the United States, and pursuant to 28 U.S.C. §§ 1343(3) and 1343(4), which confer original jurisdiction upon this Court in a civil action to recover damages or to secure equitable relief (i) under any Act of Congress providing for the protection of civil rights; (ii) under the Declaratory Judgment Statute, 28 U.S.C. § 2201; 42 U.S.C.A§ 1983.

3.      This Court has supplemental jurisdiction pursuant to 28 USC § 1367 over Plaintiff's pendent state-law claims as they arise under a common nucleus of operative facts.

4.      Venue is also proper in this Court pursuant to 28 U.S.C § 1391(b) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## PARTIES

5.      Plaintiff Amber Carr is the mother of Z.C. and as such is the most appropriate representative for him to bring forward his claims in this case. Plaintiff Carr is an adult individual and resident of the state of Texas.

6.      Plaintiff Z.C. is a minor resident of the state of Texas.

7.      Defendant Officer Aaron Dean was at all relevant times a police officer with the Fort Worth Police Department. Defendant Officer Aaron Dean is sued in his individual and official capacity.

**ORIGINAL COMPLAINT**

8.      Defendant Ed Kraus was at all relevant times the Chief of Police for the Fort Worth Police Department.  Chief Kraus was the highest-ranking officer in the police department and was the final authority on the day-to-day operation of the police department, including tactical operations, training, discipline, screening, and other matters. Defendant Chief Kraus is sued in his individual and official capacity.

9.      Defendant Betsy Price was at all relevant times the Mayor of the City of Fort Worth, Texas.  In conjunction with Defendant Chief Kraus, Defendant Mayor Price was the final authority on the day-to-day operation of the police department, including tactical operations, training, discipline, screening, and other matters. Defendant Mayor Price is sued in her individual and official capacity.

10.      Defendant Fort Worth, Texas ("the City of Fort Worth" or "the City") is a municipality duly organized and existing under the laws of the state of Texas.  Defendant Fort Worth, Texas is responsible for the funding, budget, policies, operation, and oversight of the Fort Worth Police Department. The Fort Worth Police Department is also responsible for preventive, investigative, and enforcement services for all citizens of Fort Worth. Defendant Fort Worth may be served at the Office of the City Attorney, 200 Texas St., Fort Worth, TX 76102.

## STATEMENT OF FACTS

11.      On or about, October 12, 2019 at approximately 2:25 a.m., Fort Worth Police Department received a call on a non-emergency line from James Smith, a neighbor to Ms. Jefferson's residence at 1203 E. Allen Street in Fort Worth.

12.      Mr. Smith relayed his concern that the front door of Ms. Jefferson's residence was open.

**ORIGINAL COMPLAINT**

13.     Mr. Smith did not state any other reason to warrant suspicion on the call, only stating that the door is usually closed.

14.     At the time, Atatiana Jefferson was in the home, which was owned by her mother, Yolanda Carr.

15.     Ms. Jefferson was staying in the home and taking care of her 8-year-old nephew Z.C. due to her mother's hospitalization with medical issues.

16.     Ms. Jefferson and her nephew had stayed up late that night playing video games.

17.     The door to the home was open to allow a cool breeze into the home.

18.     Fort Worth Police Officer Aaron Dean responded to the call and arrived in the vicinity of 1203 E. Allen Street at approximately 2:28 a.m.

19.     The radio call Officer Dean responded to was for an "open structure" call.

20.     Another unidentified female Fort Worth Police Officer (hereafter "Officer Jane Doe") also responded to the call and arrived at approximately 2:29 a.m.

21.     Both Officer Dean and Officer Jane Doe parked their marked police vehicles around the corner from the residence and out of view.

22.     Neither Officer Dean nor Officer Jane Doe had activated their emergency lights or sirens.

23.     Officer Dean and Officer Jane Doe undertook these actions to intentionally foreclose the opportunity to be identified as police officers.

24.     Shortly after arriving, Officer Dean approached the home and looked through the screen window at the front door.

**ORIGINAL COMPLAINT**

25.     At no point did Officer Dean knock on the door, announce himself as a police officer, or give Ms. Jefferson and Z.C. any verbal indication that he or Officer Jane Doe were there.

26.     Officer Dean proceeded to walk around the corner of the home and look into another screen door on the other side of the home.

27.     Officer Dean took these actions without a warrant, probable cause, or reasonable suspicion and in doing so violated Ms. Jefferson's and Z.C.'s constitutional privacy rights and the Fourth Amendment.

28.     After approaching the screen door,, Officer Dean once again did not knock, nor did he announce himself as a police officer or give any indication he or Officer Jane Doe were there.

29.     Officer Dean continued to search around the outside of the property using a flashlight.

30.     Officer Dean and Officer Jane Doe turned on their flashlights and looked in the cars in the driveway.

31.     The doors to both cars were closed and there were no signs of a disturbance.

32.     Officer Dean also observed the garage, and both doors on the garage were closed. Similarly, the garage provided no evidence of a disturbance of any kind.

33.     Officer Dean also observed the door on the fence next to the garage. The door was closed and there was no visible evidence of a break-in.

34.      Officer Dean then opened the fence door, moved to a window on the side of the home and shined his flashlight into the window.

**ORIGINAL COMPLAINT**

35.     Neither Officer Dean nor Officer Jane Doe provided any verbal or physical indication to Jefferson or Z.C. that they were police officers, why they were at the home, or that they were on the property at all.

36.     Ms. Jefferson became aware that someone was lurking outside, but had no way of knowing who or why was someone was outside.

37.     Ms. Jefferson went to the window to investigate.

38.     When Ms. Jefferson looked out the window, Officer Dean immediately flashed a light on her, shot her, and killed her.

39.     When Officer Dean pointed his gun at Ms. Jefferson, he did not announce himself as a police officer.

40.     Instead, he immediately shouted, "Put your hands up! Show me your hands!"

41.     While still in the middle of issuing his command, and without giving Ms. Jefferson any chance to respond, Officer Dean fired a single shot into the window at her, striking Ms. Jefferson.

42.     Z.C. was forced to watch a police officer shoot his aunt directly in front of him without any reason or warning.

43.     After Officer Dean shot Ms. Jefferson, he and his partner entered the house and attempted to give CPR to her as she bled on the floor of her own home in front of Z.C.

44.     Z.C. was forced to watch his aunt die in front of him.

45.     Ms. Jefferson was pronounced dead at the scene at approximately 3:05 a.m.

46.     The cause of death was a single gunshot wound.

47.     Z.C. was taken to a separate location and questioned by authorities without parental consent.

**ORIGINAL COMPLAINT**

48.     On October 14, 2019, Officer Dean resigned from the Fort Worth Police Department.

49.     On that same day, Officer Dean was arrested and charged with murder.

50.     On December 20, 2019, a grand jury indicted Officer Dean on the charge of murder.

## **FAILURES OF THE FORT WORTH POLICE DEPARTMENT**

51.     Between 2005-2019, the Fort Worth Police Department has displayed a consistent and systematic failure to properly train and supervise its officers on the proper use of force, and techniques and principles of de-escalation, resulting in numerous incidents of officers unnecessarily using force resulting in serious bodily injury and death, particularly against people of color.

52.     These incidents are well known in the Fort Worth community, receiving widespread media coverage.

53.     The incidents are known to policymakers Defendants Chief Kraus and/or Mayor Price as well.

54.     Not only did the Fort Worth Police Department and its policymakers Chief Kraus and/or Mayor Price tolerate the regular use of excessive force by officers, but the Department also actively attempted to downplay and cover up the use of excessive force and the commission of crimes by its officers.

55.     By tolerating the regular use of excessive force and engaging in cover-ups of the use of excessive force, Fort Worth policymakers Chief Kraus and/or Mayor Price indicated to Fort Worth officers that they were free to use force however they liked without the threat of discipline or accountability.

**ORIGINAL COMPLAINT**

*Custom of Excessive Force*

<u>Kevin Peterson</u>

56.     On August 14, 2005, Fort Worth Police officers violently grabbed Kevin Peterson while he was sleeping in his parked truck and dragged him out of the vehicle.

57.     Peterson had done nothing wrong and was sleeping in the truck when approached by the officers.

58.     The officers slammed Peterson to the ground before violently slamming his body against the bed of the truck to arrest him, causing serious bodily injuries.

59.     Despite Fort Worth PD knowledge of the incident, the officers were not disciplined.

<u>Michael Jacobs Jr.</u>

60.     In April 2009, 24-year-old Michael Jacobs Jr. was suffering from a mental health episode after failing to take his medication.

61.     Police were called to help get Jacobs to the hospital, however, instead they assaulted him and tasered him repeatedly until he died.

62.     Jacobs was unarmed and not suspected of committing any crime.

63.     None of the involved officers were disciplined despite both Fort Worth PD and City of Fort Worth knowledge of the incident and recognition of the wrongdoing by the City of Fort Worth offering the Jacobs family $2 million to resolve litigation arising from his death.

<u>Kevin Malone</u>

64.     On July 23, 2009, Fort Worth police officers stopped Kevin Malone, a black man, for allegedly driving a stolen truck.

**ORIGINAL COMPLAINT**

65.     When the officers pulled Malone over, one of the officers struck Malone with the muzzle of his gun, struck him with his knee, and ordered his canine dog to attack Malone even though Malone was already handcuffed.

66.     Despite Fort Worth PD knowledge of the incident, the officers were not disciplined.

<u>Jermaine Darden</u>

67.     On May 16, 2013, Fort Worth police officers executed a no-knock warrant at a house which Jermaine Darden, a black man, was inside.

68.     Darden complied with the officers' orders, but nonetheless was choked, kicked, punched, and tasered, causing him to suffer a fatal heart attack.

69.     Despite Fort Worth PD knowledge of the incident, the officers were not disciplined.

<u>Nelda Davis</u>

70.     On January 1, 2015, Nelda Davis, called 911 to request that a man be removed from her business.

71.     When Fort Worth Police Officers Halmagean and Olson arrived, they instead stated the man must be allowed to enter and attempted to force Ms. Davis to permit the man to enter.

72.     Officer Halmagean then grabbed Nelda Davis's arm and twisted it behind her back causing it to fracture.

73.     Officers Olson and Halmagean then joked that Nelda Davis had "learned her lesson" and released her without charging her with a crime.

74.     Despite Fort Worth PD knowledge of the incident, neither Officers Olson nor Halmagean were disciplined.

**ORIGINAL COMPLAINT**

<u>Phillip Vallejo</u>

75.     On July 30, 2015, Phillip and Brenda Vallejo went to Ojos Locos to celebrate Phillip's 30th birthday.  While there, Brenda was harassed by a group of men. Her partner, Phillip Vallejo, got into a verbal altercation with the men until one of the men revealed he had a gun.

76.     At that time, Phillip and Brenda exited Ojos Locos and separated from the men. Shortly thereafter, Fort Worth Officer Ochsendorf arrived.

77.     Upon arrival, Officer Ochsendorf drew his gun and shot Phillip Vallejo multiple times in the back, killing him.

78.     Upon information and belief, despite Fort Worth PD knowledge of the incident, Officer Ochsendorf was not disciplined.

79.     A civil suit for excessive force remains pending against Officer Ochsendorf.

<u>Craigory Adams</u>

80.     On June 23, 2015, Craigory Adams, a black man, knocked on a neighbor's door carrying a barbeque fork, which he said he carried around to keep away stray dogs.

81.     The neighbor called Fort Worth police.

82.     Despite the fact that Adams had not committed a crime and was no threat to anyone, one of the responding officers pointed a shotgun at Adams and fired it, striking him in the arm.

83.     Despite Fort Worth PD knowledge of the incident, none of the involved officers were disciplined.

<u>David Collie</u>

84.     In July of 2016, FWPD officer Barron shot unarmed David Collie, a black man, in the back as he walked away from police.

**ORIGINAL COMPLAINT**

85.     Officers initially claimed that Collie had raised a weapon at police, but videocapturing the incident disproved this narrative.

86.     Collie had committed no crime, but nonetheless was subjected to potentially deadly force by the FWPD.

87.     As a result of the shooting, Collie is now paralyzed from the waist down.

88.     Despite the video capturing the incident which was in the possession of the FWPD, the involved officers were not disciplined.

<u>Henry Newson</u>

89.     In November 2016, Henry Newson, a black man, was standing outside the hospital after being discharged waiting for a ride home.

90.     Fort Worth Police arrived while he was being questioned by security about why he was there.

91.     When he refused to leave, a white FWPD officer punched him in the face.

92.     Upon information and belief, despite Fort Worth PD knowledge of the incident, the officer was not disciplined.

<u>Dorshay Morris</u>

93.     In August 2017, Dorshay Morris, a black woman, called Fort Worth police to report her boyfriend threatening her. When officers arrived, they treated her like a suspect, and when she refused to give her ID to officers one of the officers grabbed her by the hair.

94.     FWPD Sergeant Kenneth Pierce, who is white, ordered a rookie officer to shoot Morris with a Taser despite the fact that there was no basis for the use of the Taser.

95.      She was taken into custody and charged with aggravated assault with a deadly weapon and resisting arrest.  The charges were subsequently dropped.

**ORIGINAL COMPLAINT**

96.     Sergeant Price was initially fired, but ultimately was reinstated.

Cody Wayne Seals

97.     On June 1, 2019, Army Veteran Cody Wayne Seals, who suffered from post-traumatic stress syndrome, suffered a mental breakdown in his home. A police stand-off ensued.

98.     Seals exited his home and began walking towards the officers carrying only a flashlight.

99.     Nonetheless, the officers shot and killed Seals.

100.    Despite Fort Worth PD knowledge of the incident, none of the involved officers were disciplined.

Unnamed Minor Female

101.    In an incident reviewed by the Fort Worth Police Department Expert Review Panel (discussed in detail *infra*), FWPD officers responded to a call for a suicidal teenager.

102.    The young woman refused to get out of a parked car to speak with the officers. The officers immediately began to forcibly remove her from the car and slammed her to the ground. After they handcuffed her, one officer dragged her across the sidewalk and street by her hands.

103.    The officer then aggressively pushed her into the car as she begged to speak to her mother. As she resisted, the officer grabbed her by her legs and shoved her in; she had urinated on herself and her shirt fell off exposing her breasts.

104.    The officers made no attempt to de-escalate and did not call a Crisis-Intervention Trained Officer. When the young woman stepped outside the car again, nude from the waist up, an officer sprayed her with pepper spray four times, directly in the face.

105.    Despite Fort Worth PD and the City of Fort Worth knowledge of the incident, none of the involved officers were disciplined.

**ORIGINAL COMPLAINT**

106.   All of the above-described incidents received media attention and/or were the subject of litigation involving the City of Fort Worth.

107.   As such, Defendants Officers Kraus and Price knew or reasonably should have known about each and every incident.

*Custom of Racial Animus and Discrimination*

108.   In December 2018, a task force was created by the City of Fort Worth to address issues in race and policing. The task force released a report concluding that the City had failed to address perceptions amongst residents that there was systematic racism in the Fort Worth Police Department.

109.   The task force was asked to "identify patterns and practices related to police interactions with the public during investigative stops, searches, arrests, de-escalation and use of force incidents."

110.   While the task force recommended that the City have continued conversations with the community, it failed to recommend any changes to already existing police policies that have disproportionately affected the city's minority community.

111.   In 2017, Black men and women accounted for 18% of the City's population but constituted 41% of the arrests made by FWPD.

112.   The Fort Worth Police Department's racially discriminatory practices have manifested themselves within the internal operations of the department.

113.   In January 2015, former Police Chief Jeff Halstead resigned after six years on the job.

**ORIGINAL COMPLAINT**

114.    Chief Halstead resigned after both the Black and Latino officers' associations called for his removal after an investigation documented his failure to address racially hostile behavior within the department.

115.    This racially discriminatory atmosphere is reflected in the employment and promotion practices of FWPD.

116.    In 2017, FWPD sworn personnel were 65% white while the Fort Worth population was only 38% white.

117.    The corporal/detective level is the first level of promotion within the FWPD.

118.    Black FWPD officers constituted just 7% of corporals/detectives.

119.    Black FWPD officers were excluded in the entirety from specialized units within the FWPD.  In 2017, the following specialized units had zero black officers:

> i.    SWAT (26 officers);
>
> ii.    K-9 (11 officers);
>
> iii.    Criminal Intelligence (11 officers);
>
> iv.    Homicide (11 officers);
>
> v.    Major Cases (11 officers); and,
>
> vi.    Robbery (16 officers).

120.    The City knew of and tolerated racism within the FWPD.

121.    The City's failure to address these longstanding issues regarding race and the use of excessive force caused the death of Atatiana Jefferson and the assault of Z.C.

*Failure to Discipline and Ratification and Departmental Cover-up of Excessive Force*

**ORIGINAL COMPLAINT**

122.    On December 21, 2016, Jacqueline Craig, a black woman, called police after her neighbor, a white man, assaulted her 8-year-old son after he spilled raisins on the ground outside the man's house.

123.    Fort Worth Police Officer William Martin, responded to the call. One of the first questions Officer Martin asked was, "So why don't you teach your son not to litter?"

124.    After Ms. Craig told him that her neighbor did not have the right to put his hands on her son, whether he had littered, the officer asked, "Why not?"

125.    Officer Martin told her that if she did not stop yelling at him, "you're going to piss me off, and I'm going to take you to jail."

126.    The Officer subsequently falsely arrested Ms. Craig.

127.    The matter was investigated, and the officers who conducted the investigation recommended Officer Martin be terminated.

128.    However, the Fort Worth Police Department only suspended Officer Martin for ten days.

129.    The investigating officers who recommended firing were then demoted for allegedly disseminating a video of the arrest.

130.    The officers filed a whistleblower lawsuit against the City, alleging they were retaliated against for reporting that Officer Martin committed a crime.

131.    A motion for summary judgement filed by the City of Fort Worth was denied, and the lawsuit remains pending.

*Systemic Departmental Failures*

132.    In the wake of the shooting death of Atatiana Jefferson, the City formed an Expert Panel to analyze the issues and failures within the FWPD.

**ORIGINAL COMPLAINT**

133.    The purpose of the Expert Panel review is "to identify patterns and practices related to police interactions with the public during investigative stops, searches, arrests, de-escalation and use of force incidents."

134.    On July 31, 2020, the Expert Panel released its initial findings.

135.    The Expert Panel review of files found encounters that start with officers yelling a command, often with weapons drawn, under circumstances where no apparent threat is present.

136.    The Panel additionally found significant evidence of "officers failing to take time to permit a subject to calm down or comply, take advantage of distance, or wait for backup."

137.    As a result of these findings and others, the Panel concluded "that officers are not consistently adhering to policies to avoid force during encounters with community members and these policies are not enforced by the department."

138.    The Panel found "that the de-escalation policy is not uniformly followed and is inadequately enforced."

139.    Further, the Panel's found that FWPD has an admitted "para-military" mindset that leads to aggressive tactics from the onset of an encounter, to the detriment of the community and in particular, Atatiana Jefferson and Z.C.

140.    These failures resulted in Defendant Officer Dean killing Ms. Jefferson and assaulting Z.C., rather than adhering to their duty and ensuring their safety.

141.    Thus, the City's failures caused Atatiana Jefferson's death.

*Failure to Screen, Train, and Monitor Defendant Dean*

142.    Officer Aaron Dean was hired to the Fort Worth Police Department despite the Department's knowledge that he had previously assaulted a woman in 2004 by grabbing her breast without consent at the University of Texas.

**ORIGINAL COMPLAINT**

143.   As a result of the incident, Officer Dean pled no contest to assault.

144.   In video footage of Officer Dean's job interview with the Fort Worth Police Department, Dean acknowledged the incident, admitting that he committed the crime of assault.

145.   Officer Dean's conviction demonstrated a propensity for violence that is reflected in his employment records that note Officer Dean had "tunnel vision" and "needs improvement on communicating with the public and fellow officers."

146.   Despite these concerns and the obvious implication that Officer Dean's deficiencies were likely to result in physical harm or a constitutional violation, the City of Fort Worth never took any additional steps to train Officer Dean.

147.   Further training would have improved Officer Dean's treatment of Fort Worth citizens and protected the constitutional rights of the citizens he encountered.

148.   The City's failure to provide such training caused the death of Ms. Jefferson and the assault of Plaintiff Z.C.

*Lack of Policy and Deficient Training on Open Structure Response*

149.   Under FWPD Directive 327.05, Fort Worth police officers are to investigate reports of "open doors" the same way as they would investigate a call for a "silent alarm," Directive 327.01.

150.   In other words, the Fort Worth Police Department does not have a specific policy directive for officers responding to a report of an open door and tells its officers to treat such calls the same as a home's alarm going off.

151.   The department makes no distinction between an alarm going off and a front door being open.

**ORIGINAL COMPLAINT**

152.    Directive 327.01 does not give any guidance as to how to determine whether there has been a forced entry at a home, how to determine if someone already inside the home is a burglar or assailant, or when the use of force is appropriate if an officer suspects there is a burglar or assailant inside the home.

153.    Therefore, FWPD policy contemplates officers responding to a wellness check for an open door in the same manner as they would respond to a burglary in progress, equating a welfare check with an active felony investigation.

154.    This policy is reflective of the FWPD's gross failure to properly train and enforce de-escalation policies.

155.    The result of this deficient and indiscriminate policy and the abject failure to train and enforce de-escalation concepts was the death of Atatiana Jefferson and the assault of Plaintiff Z.C.

### FIRST CAUSE OF ACTION
Violation of the Fourth Amendment to the U.S. Constitution
42 U.S.C. § 1983
*Plaintiff against Defendant Aaron Dean*

156.    Plaintiff repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

157.    Defendant Officer Dean violated the Fourth Amendment rights of Z.C. when he entered the side and rear of the property without probable cause or reasonable suspicion.

158.    Defendant Officer Dean engaged in a course of conduct that violated Plaintiff's Fourth Amendment rights which began with his unlawful entry onto the property and culminated with him murdering Ms. Jefferson in front of Z.C. and assaulting Z.C. by threatening him with a deadly weapon, a firearm.

**ORIGINAL COMPLAINT**

159.   Plaintiff would show that Defendant Officer Dean failed to act as an objectively reasonable officer would have acted in the same or similar circumstances. That is, Defendant Officer Dean, without justification and the need to do so, used excessive and deadly force as described above and killing Ms. Jefferson without legal justification in the presence of Z.C. and assaulting Z.C.

160.   The excessive and deadly force used by Defendant Officer Dean was not objectively reasonable, justified, nor was it necessary under the circumstances.

161.   Plaintiff would show that Defendant Officer Dean denied Z.C. of his right to be free from the use of excessive force in violation of the 4th Amendment to the United States Constitution.

162.   Defendant Officer Dean knew, or should have reasonably known, that his actions were in violation of Z.C's constitutional rights.

163.   Defendant Officer Dean embarked on a willful, malicious, reckless, and outrageous course of conduct that was intended to cause and, in fact, caused Z.C. to suffer extreme and severe mental and emotional distress, anxiety, terror and agony.

164.   Plaintiff's requests for relief are set forth below.

### SECOND CAUSE OF ACTION
Municipal Liability under 42 U.S.C. § 1983
*Plaintiff against Defendants City of Fort Worth, Ed Kraus, and Betsy Price*

165.   Plaintiff repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

166.   The customs, practices, and policies of the City of Fort Worth were a moving force behind Defendant Dean's violation of Z.C.'s constitutional rights.

**ORIGINAL COMPLAINT**

167.    Z.C. was deprived of rights and privileges secured to him by the United States Constitution and by other laws of the United States, by the City of Forth Worth through its many failures addressed *supra*.

168.    Policymakers Chief Kraus and/or Mayor Price knew of the failures of the Fort Worth Police Department as discussed herein but failed to take the necessary steps to rectify the failures and adequately protect the constitutional rights of the people of Fort Worth.

169.    These failures and the refusal to rectify them were the moving force behind the deprivation of Z.C.'s constitutional rights.

170.    Plaintiff's requests for relief are set out below.

## JURY DEMAND

171.    Plaintiff demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests judgment against Defendants as follows:

A.  Enter a declaratory judgment that Defendants' policies and practices violate the Fourth Amendment rights against unreasonable search and seizure with respect to the Plaintiff;

B.  Awarding all damages which Plaintiff has sustained as a result of Defendants' conduct, including medical bills emotional distress, and anguish;

C.  Awarding Plaintiff reasonable and necessary attorneys' fees and expenses which Plaintiff has incurred and will continue to incur during all trial and appellate court proceedings pursuant to 42 U.S.C. § 1988;

**ORIGINAL COMPLAINT**

D.  That the Court retain jurisdiction over Defendants until such time as it is satisfied that they have remedied the practices complained of and are determined to be in full compliance with the law; and

E.  Awarding Plaintiff such other and further legal and equitable relief as may be found appropriate and as the Court may deem just or equitable.

Plaintiff also seeks injunctive relief, including, but not limited to:

A.  Supervisory discipline up to and including termination for any employee or agent of the City of Fort Worth or any other Defendant who engages in actions violating the Fourth Amendment;

B.  Grant such other and further relief as appears reasonable and just, to which Plaintiff may be entitled and may prevent future Constitutional violations by Defendants.

Dated: September 15, 2021                        Respectfully submitted,

*/s/ David W. Henderson*
David W. Henderson
Texas State Bar No. 24032292
dhenderson@equalrights.law
Jay D. Ellwanger
Texas State Bar No. 24036522
jellwanger@equalrights.law
**ELLWANGER LAW LLLP**
400 S. Zang Blvd. Ste. 1015
Dallas, TX 75208
Telephone: (469) 998-6775
Facsimile: (469) 998-6775

**ORIGINAL COMPLAINT**